UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| JENNIFER D. SIMMS, | CASE NO. 1:22-CV-02260-BMB |
| Plaintiff, | JUDGE BRIDGET M. BRENNAN |
| vs. | MAGISTRATE JUDGE DARRELL A. CLAY |
| COMMISSIONER OF SOCIAL SECURITY, | **REPORT AND RECOMMENDATION** |
| Defendant. | |

## INTRODUCTION

Plaintiff Jennifer D. Simms challenges the Commissioner of Social Security's decision denying disability insurance benefits ("DIB"). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). On December 16, 2022, pursuant to Local Civil Rule 72.2, this matter was referred to me to prepare a Report and Recommendation. (Non-document entry dated Dec. 16, 2022). Following review, and for the reasons stated below, I recommend the District Court **AFFIRM** the Commissioner's decision.

## PROCEDURAL BACKGROUND

Ms. Simms filed for DIB on January 27, 2021, alleging a disability onset date of December 7, 2020. (Tr. 171-72). The claim was denied initially and on reconsideration. (Tr. 61-71, 73-82). She then requested a hearing before an Administrative Law Judge. (Tr. 100-01). Ms. Simms (represented by counsel) and a vocational expert ("VE") testified before the ALJ on February 11,

1

2022. (Tr. 37-59). On July 7, 2022, the ALJ issued a written decision finding Ms. Simms not

disabled. (Tr. 7-31). The Appeals Council denied Ms. Simms's request for review, making the

hearing decision the final decision of the Commissioner. (Tr. 1-6; *see* 20 C.F.R. §§ 404.955,

404.981). Ms. Simms timely filed this action on December 15, 2022. (ECF #1).

FACTUAL BACKGROUND

I.     ADMINISTRATIVE HEARING

At the hearing, Ms. Simms testified about how her physical and mental health impairments

affect her ability to function. She graduated from high school and had vocational training in

patient care technology, phlebotomy, and medical coding. (Tr. 41). She lives with her two youngest

children, ages 11 and 12. (*Id.*).

Ms. Simms has constant pain in her low back that radiates down her right leg. (Tr. 44). The

pain is worsened by prolonged periods of sitting and walking. (Tr. 45). She can stand in one place

for 10 to 15 minutes, walk for 20 minutes, and sit for 10 minutes at a time. (Tr. 45-46). If her legs

are elevated, Ms. Simms can sit for 25 to 30 minutes before she needs to move. (Tr. 46). She finds

it difficult to get comfortable. (*Id.*). Neuropathy in her feet makes it difficult to wear shoes of any

kind. (Tr. 58). Ms. Simms spends about six hours each day lying down or in a reclined position.

(Tr. 47). She has tried heat, ice, and soaking in the bathtub for pain relief; while helpful, her pain

resumes immediately after. (*Id.*). She does not have any side effects from her medications. (Tr. 53).

Ms. Simms tends to fall often. (Tr. 47). Although she can shower and get dressed on her

own, Ms. Simms likes to do so when her children are home so they can call for help if she falls.

(*Id.*). Ms. Simms's daughter helps in the kitchen. (*Id.*). They opt for quick, easy meals because Ms.

Simms cannot stand long enough to make an elaborate meal. (Tr. 47-48). She can also handle the

2

household chores, but it takes her longer to complete than it used to because she moves slower and must take breaks. (Tr. 48).

Ms. Simms experiences panic attacks and has depression and anxiety. (Tr. 49). Her symptoms randomly occur; neither she nor her counselor have identified a specific trigger for the panic attacks. (Tr. 49-50). She has panic attacks even when she is at home. (Tr. 50). These occur every day, lasting five minutes to one hour and averaging 10 to 15 minutes. (*Id*.). When she has a panic attack, she feels like she cannot breathe. (Tr. 49). She uses breathing exercises and meditation to help relieve symptoms. (Tr. 50). Ms. Simms does not like being in crowds and "freaks out" when she visits the grocery store. (Tr. 49). She orders her groceries online and her adult son delivers them to her house. (Tr. 50). Her older son regularly checks on her and helps with the younger children. (Tr. 52).

Ms. Simms's mental health impairments cause sleep disturbances; sometimes, she does not sleep for two or three days because she "[cannot] shut [her] brain off." (Tr. 51). A couple times each week, Ms. Simms does not want to get out of bed because she gets "freaked out." (*Id*.). She regularly gets up at 6:00 a.m. with her children. (Tr. 52). Sometimes it takes her longer to get going because she gets dizzy or passes out in the morning. (*Id*.). She holds on to the furniture to wake her children and scoots down the stairs to sit in the recliner while they get ready for school. (*Id*.). When the children are gone, Ms. Simms tries to clean, prepare dinner, do laundry, read, and watch some television. (Tr. 53). She does crossword puzzles to try to keep her mind off things. (*Id*.).

VE Connie O'Brien identified Ms. Simms's past relevant work as phlebotomist and lab technician (DOT 079.364-022, light exertion, SVP 3). (Tr. 54-55). The ALJ asked the VE if a hypothetical individual of Ms. Simms's age, education, and experience could perform her past

relevant work if restricted to medium exertion work and subject to the following limitations: can frequently climb ramps and stairs; occasionally climb ladders, ropes, and scaffolds; frequently stoop, kneel, crouch, and crawl; perform simple, routine tasks learned by brief demonstration in up to 30 days; no fast-paced work or strict production quotas; tolerate occasional changes and occasional decision-making in a static environment; must avoid positions requiring supervision, arbitration, and mediation; and changes must be well-explained. (*Id.*). The VE testified the hypothetical individual could not perform Ms. Simms's past relevant work, but identified other medium exertion positions the individual could perform, including maintenance worker (DOT 899.687-014, SVP 2, 65,000 jobs nationally), floor waxer (DOT 381.687-034, SVP 2, 60,000 jobs nationally), and lab equipment cleaner (DOT 381.687-022, SVP 2, 88,000 jobs nationally). (Tr. 55-56).

The ALJ then asked the VE if the hypothetical individual could perform work if restricted to light exertion work and subject to the following limitations: can frequently climb ramps and stairs, but never ladders, ropes, or scaffolds; frequently stoop, kneel, crouch, and crawl; requires a sit/stand option that allows for five minutes of sitting per every hour of standing; can occasionally push and pull with the bilateral upper extremities; occasionally use foot controls with the bilateral lower extremities; must avoid hazards including heavy moving machinery and unprotected heights; limited to simple, routine tasks learned by brief demonstration in up to 30 days; no fast-paced work; no strict production quotas; can tolerate occasional changes and occasional decision-making in a static environment with changes well-explained; must avoid positions requiring supervision, arbitration, and mediation; and can be off-task 3 to 4 minutes at a time, up to 20 minutes per day. (Tr. 56). The VE identified three light positions the hypothetical individual could perform,

including office helper (DOT 239.567-010, SVP 2, 60,000 jobs nationally), merchandise marker (DOT 209.587-034, SVP 2, 75,000 jobs nationally), and routing clerk (DOT 222.587-038, SVP 2, 50,000 jobs nationally). (Tr. 56-57). If the hypothetical individual's impairments affect her to the degree that she would be absent from work one day a month, she would not be able to perform Ms. Simms's past relevant work but could perform the other identified positions. (Tr. 57).

Finally, the VE testified that being off task more than 10% of the workday precludes all work. (*Id.*).

## II.    PERSONAL AND VOCATIONAL EVIDENCE

Ms. Simms was 42 years old on the alleged onset date and 43 years old at the administrative hearing. (Tr. 61). She graduated from high school. (Tr. 41). In the past, Ms. Simms has been employed as a phlebotomist and lab technician. (Tr. 55).

## III.   RELEVANT MEDICAL EVIDENCE

On December 4, 2020, Ms. Simms called her primary care physician Carolyn Guarino-Vogler, M.D., to request something for her nerves to help with increased stress due to the two-year anniversary of her husband's death and her mother's illness. (Tr. 374). Dr. Guarino-Vogler prescribed Valium. (*Id.*). She also advised Ms. Simms to meet with a counselor. (Tr. 373). On December 14, 2020, Dr. Guarino-Vogler called Ms. Simms and ordered her to increase her dose of Cymbalta. (Tr. 372).

On December 23, 2020, Ms. Simms attended an intake counseling session with Richard Meeker, MSW, LISW-S.[1] (Tr. 398). There, she reported increasing irritability, getting one or two hours of sleep at night, and having three to four panic attacks since mid-November. (*Id.*). Her

---

[1]    All counseling sessions were held by video.

symptoms include chest pressure and feeling like she cannot breathe. (*Id.*). Mr. Meeker concluded Ms. Simms had depressive disorder, generalized anxiety disorder, and post-traumatic stress disorder (PTSD). (Tr. 399).

On January 4, 2021, Ms. Simms met with Dr. Guarino-Vogler to discuss her back pain, grief, depression, and anxiety. (Tr. 371). Ms. Simms reported her back pain had subsided to baseline and indicated the exacerbation was probably related to a kidney stone because she had a painful episode of urination that passed; following that, her leg pain resolved. (*Id.*). She endorsed "slightly less frequent episodes of emotional instability" and indicated today was her first day leaving the house beyond picking up curbside groceries. (*Id.*). Ms. Simms reported taking Valium and Cymbalta. (*Id.*).

During a counseling session with Mr. Meeker on January 6, 2021, Ms. Simms reported not wanting to see or talk to anyone. (Tr. 400). She also noted diazepam did not make her sleepy. (*Id.*).

On January 11, 2021, Dr. Guarino-Vogler noted the following:

> Patient paged me in a panic yesterday, stating she had tried to go shopping and ended up in a corner of the store breaking down and crying. Said she wasn't even sure why she got so upset in that moment. However, she was scheduled to return to work today and is "terrified" of returning because she will be the only one in the lab for at least 2 hours and won't have anyone else to help if she starts breaking down. I told patient that I do not think she should return to work at this time, as her ability to control emotions appropriately is severely impaired.

(Tr. 370). The doctor ordered Ms. Simms to attend weekly counseling sessions. (Tr. 369).

On January 16, 2021, Ms. Simms reported to Mr. Meeker that she was doing okay but felt the urge to cry and was trying to not "freak out." (Tr. 401). She reported feeling overwhelmed when she tried to visit a shoe store but denied feeling anxious; she just "didn't feel like doing anything." (*Id.*). She also described leaving the house on January 15 and traveling to Columbus but

6

reported she usually does not go anywhere. (*Id.*). On January 26, Ms. Simms reported doing "about the same," and enjoyed spending time in Columbus but needed to leave because she was "panicky." (Tr. 402). She reported going to the casino but "just wanted to leave." (*Id.*). Otherwise, Ms. Simms discussed her reluctance to drive on her own and her anxiousness at the thought of going back to work with patients. (*Id.*).

During a virtual telehealth appointment with Dr. Guarino-Vogler on January 29, 2021, Ms. Simms endorsed "multiple symptoms of unknown origin," including dental pain, daily headaches between her eyes and nose, getting dizzy and falling almost daily, worsened memory loss, severe mood swings, high anxiety, and unpredictable crying spells. (Tr. 335). Dr. Guarino-Vogler suspected the headache and dental pain originated from a sinus infection and prescribed an antibiotic, ordered Ms. Simms to stop Cymbalta, and directed that she resume taking Zoloft. (*Id.*).

On February 2, 2021, Ms. Simms called Dr. Guarino-Vogler to report the following:

> This weekend she became dizzy and then experienced syncopal episode in which she fell hard against a piece of furniture, impacting right frontal area of head. She came to after this and was taken to ER by friend. Had evaluation in ER, including EKG, Head CT. Sources of [symptoms] not pinned down to a specific cause. Did sustain a small hematoma [right] forehead at hairline. She is also reporting that she has had progressive memory loss. I'm suspicious this could be a medication side effect from Cymbalta, worsening in time frame since it was increased from 60 mg to 90 mg. Patient says her right eye is now showing notable swelling, particularly below eye. Forwarded pictures, which did not show other visible abnormalities [except] swelling. [No] vision [changes], had her palpate orbital rim and [no] unusual pain elicited. Advised to continue NSAIDs, ice packs as needed and let her know she may get "black eye" coloration [changes] soon. Also noted she had appointment [with] counselor this evening.

(Tr. 334).

7

Ms. Simms also reported this fall to Mr. Meeker, claiming she fell and hit the closet door hinge, resulting in a hematoma. (Tr. 404). Otherwise, she denied experiencing any major panic attacks since their last session; she had a small panic attack when she went to the casino but was able to stay. (*Id.*). She also reported difficulty sleeping due to pain. (*Id.*).

On February 4, 2021, Ms. Simms called Dr. Guarino-Vogler and stated she still had a headache and wanted to know if she qualified for a handicap placard. (Tr. 333). Dr. Guarino-Vogler's notations indicate it may take a while for her headache to get better and she would provide a handicap placard. (*Id.*).

On February 11, 2021, Ms. Simms met with Mr. Meeker and reported that things were going "sort of okay," and advised that she had a panic attack over the weekend. (Tr. 405).

On February 18, 2021, during a virtual telehealth appointment with Dr. Guarino-Vogler, Ms. Simms endorsed continued head pain in the area of her injury and some improvement in memory loss. (Tr. 328).

On February 20, 2021, Ms. Simms met with Mr. Meeker and reported having no anxiety attacks. (Tr. 406). They rescheduled their video session as Ms. Simms was not feeling well. (*Id.*). On February 26, 2021, Ms. Simms reported doing okay but not sleeping much and feeling exhausted. (*Id.*).

On March 8, 2021, Ms. Simms had a telehealth appointment with Dr. Guarino-Vogler, where she reported her memory "is almost back to baseline," but endorsed poor mood, agitation, and intermittent episodes of disequilibrium. (Tr. 325). She also reported worsening right leg pain with a pins and needles sensation and cold feet, but without swelling. (*Id.*). Ms. Simms indicated

her pain was severe enough that her current pain medication was not effective. (*Id.*). The doctor ordered Ms. Simms to continue taking Zoloft and add Seroquel and oxycodone. (*Id.*).

On March 15, 2021, Ms. Simms met with Mr. Meeker and described doing "good." (Tr. 407). She reported one panic attack after she accompanied her boyfriend to the emergency department, where he was found to have a blood clot, the same condition that led to her husband's unexpected death. (*Id.*). She described feeling like she could not breathe. (*Id.*). Otherwise, Ms. Simms told Mr. Meeker that she intended to try to go for a drive soon. (*Id.*).

Ms. Simms met with Mr. Meeker again on March 22, 2021, where she reported doing "okay" but was moody over the weekend and still struggled to fall asleep. (Tr. 408). She stated she is home by herself during the day and does chores, watches television, and works on puzzles to keep busy. (*Id.*). On March 29, she informed Mr. Meeker that she went to Aldi the day before without incident, though it took a while, and endorsed falling asleep faster and sleeping a little longer. (Tr. 409). She reported being physically okay except her feet hurt. (*Id.*).

On April 12, 2021, Ms. Simms met with Mr. Meeker and reported having one anxiety attack while watching television at home with her children. (Tr. 410). Her children remained in the room while she breathed through the episode for a half hour. (*Id.*). Otherwise, she reported going to the store again over the weekend. (*Id.*).

On April 13, 2021, Ms. Simms attended a follow-up visit with Dr. Guarino-Vogler and complained of back and hip pain, pain in her leg for two months, and cold feet that are painful to the touch but not numb. (Tr. 324). Ms. Simms previously received epidural shots but declined additional shots as a treatment option. (*Id.*). The doctor increased Ms. Simms's Zoloft and ordered her to stop taking Simvastatin as it may be causing the neuropathic pain in her feet. (*Id.*).

On April 29, 2021, Ms. Simms met with Mr. Meeker and endorsed having "ups and downs," feeling depressed, and not wanting to do anything; however, she also reported going to the store recently. (Tr. 411). That same day, Ms. Simms had a telehealth visit with Dr. Guarino-Vogler and complained of back pain and difficulty walking, bluish purple feet, lightheadedness, dizziness upon standing, vertigo, numbness and tingling, balance problems, burning feet, anxiety, depression, and sadness. (Tr. 322). Ms. Simms reported being able to discuss her deceased husband that day at her counseling session. (*Id.*). She stated she was not ready to return to work because she is still anxious being around people. (*Id.*). Even with the addition of Seroquel, Ms. Simms remained moody and angry. (*Id.*). She also endorsed repeated loss of hearing, lightheadedness, and some heart palpitations she felt could be caused by anxiety. (*Id.*). Dr. Guarino-Vogler prescribed Diltiazem for her feet, ordered an EMG for paresthesia and radiculopathy, increased the dose of Seroquel to better control depression and anxiety, and ordered a Holter monitor to evaluate for arrhythmia as a possible source of dizziness and episodes of syncope. (*Id.*).

A lumbar spine X-ray, dated May 7, 2021, revealed moderate to severe degenerative changes at L5-S1 and moderate changes at L4-L5. (Tr. 303).

On May 20, 2021, Ms. Simms met with Mr. Meeker and reported feeling unwell due to a headache and dizziness, and having no energy or desire to do anything. (Tr. 412). She drove recently and reported things were "getting better." (*Id.*). On May 27, Ms. Simms reported things going okay but that she was feeling anxious. (Tr. 413). She described going to the park for 90 minutes and indicated she would continue to go. (*Id.*).

10

On July 8, 2021, Ms. Simms met with Mr. Meeker and reported feeling a little better. (Tr. 414).

On July 22, 2021, Ms. Simms presented to Dr. Guarino-Vogler for a follow-up visit. (Tr. 317). There, she endorsed an inability to sustain attention, difficulty with complex tasks, difficulty maintaining concentration for an extended period of time, trouble regulating emotions, some mood swings and irritability, and inability to interact appropriately in public. (*Id.*). Physically, she reported experiencing pins and needles, numbness, and neuropathy symptoms in her legs, which are intermittently achy and more severe when she lies down, and daily headaches associated with blurred vision. (*Id.*). She claimed gabapentin worked well for her. (*Id.*). Dr. Guarino-Vogler prescribed a beta blocker to slow down Ms. Simms's heart rate, increased gabapentin, and ordered a back X-ray. (Tr. 318).

Beginning in August 2021, Ms. Simms often communicated with Dr. Guarino-Vogler through a messaging service. (*See* Tr. 451-71). On August 2, 2021, Ms. Simms reported a recent emergency department visit for high blood sugar, for which the treating provider prescribed Glimepiride to be taken with her Metformin; she requested Dr. Guarino-Vogler continue her prescription for Glimepiride until she met with her endocrinologist. (Tr. 471). On August 4, she messaged Dr. Guarino-Vogler about continued pain in her feet despite the increase in gabapentin; the doctor ordered Ms. Simms to double the dose. (Tr. 470-71).

On August 11, 2021, Mr. Meeker rescheduled their counseling session because Ms. Simms was driving her daughter to school when he called. (Tr. 415).

On August 13, 2021, Ms. Simms met with her endocrinologist who found diminished monofilament sensation in both feet. (Tr. 449).

When Ms. Simms's pharmacy did not have her prescribed 10 mg dose of oxycodone, in stock, Dr. Guarino-Vogler prescribed 20 mg and instructed Ms. Simms to cut the pill in half. (*See* Tr. 469-70). Ms. Simms contacted the doctor on August 25 and explained she forgot to cut the oxycodone in half for a few days but noticed the increased dose helped with her back pain. (Tr. 468). When she returned to her normal dose, she noted it to be ineffective; she requested the doctor refill her prescription at the increased 20 mg dosage. (*Id.*). Dr. Guarino-Vogler declined to increase the dose and ordered Ms. Simms to continue taking half of the 20 mg pill. (Tr. 467-68).

On August 30, 2021, Ms. Simms requested a video chat to discuss the pain in her feet that made it difficult for her to walk. (Tr. 466). She reported being unable to stand for long because of pain so severe that she is frequently crying by the end of the day. (Tr. 475). She complained of dizziness, chest pain, lightheadedness, vertigo, imbalance, and increased falls, but denied passing out. (*Id.*). Dr. Guarino-Vogler noted the Holter monitor did not show arrythmia that might explain her dizziness. (*Id.*). Her EMG showed moderate bilateral S1 radiculopathies. (*Id.*). The doctor also noted some slurred speech, but her responses were appropriate and without delay. (Tr. 476). Dr. Guarino-Vogler discontinued Seroquel to determine if it is the source of her dizziness and ordered a lumbar MRI. (*Id.*).

On September 2, 2021, Ms. Simms met with Mr. Meeker and described her "anxiety at home has been fine," rating it at 3. (Tr. 416). She reported feeling fine around one or two other people but having more difficulty being around larger groups and feeling anxious in cramped stores. (*Id.*).

On September 4, 2021, Dr. Guarino-Vogler contacted Ms. Simms to ask for an update on her dizziness, to which Ms. Simms replied, "not as bad but still have it." (Tr. 466).

12

On September 27, 2021, Ms. Simms attended a routine visit with Dr. Guarino-Vogler and reported increased back pain radiating down her legs into her feet, difficulty walking due to the burning pain in her feet, and headaches. (Tr. 477). She reported gabapentin was not helping as much and causing fatigue. (*Id.*). Otherwise, Ms. Simms reported continued panic attacks and more anxiety, with no change in her dizziness after discontinuing Seroquel. (*Id.*). The doctor referred Ms. Simms to a neurosurgeon for back and leg pain and reduced her dose of gabapentin. (Tr. 478).

On November 3, 2021, Ms. Simms met with Mr. Meeker and reported having "ups and downs," but that she has been more active and did some painting. (Tr. 417).

On November 15, 2021, Ms. Simms contacted Dr. Guarino-Vogler and reported having a syncopal episode the day before where she "blacked out," hit her head on the sink, and landed on her knees. (Tr. 460). She also endorsed a daily headache. (*Id.*). The following day, she met with the doctor and reported difficulty sleeping, dizziness and lightheadedness, fatigue, sinus pain, chest pressure and discomfort, difficulty breathing, neck and back pain with lower extremity paresthesia, and headaches. (Tr. 479). She described being awake for two days and having noticeable forgetfulness. (*Id.*). Ms. Simms identified her current medications as clonazepam, gabapentin, Zoloft, oxycodone, Metoprolol, Tizanidine, Glimepiride, and Metformin, and agreed to restart Seroquel. (Tr. 479-80). The doctor prescribed antibiotics for her sinus infection and a steroid pack for neck pain, continued her prescription for oxycodone, and ordered a brain MRI. (Tr. 480).

On November 17, 2021, Ms. Simms met with Mr. Meeker and reported doing "okay." (Tr. 418). On December 8, she reported doing "better" and that she was able to get out of the house. (Tr. 419). On December 17, she described "slowly getting things done" for Christmas, including decorating the house. (Tr. 420).

On January 4, 2022, Ms. Simms met with Dr. Guarino-Vogler and complained of a constant headache, frequent pre-syncopal symptoms of dizziness and lightheadedness that are sometimes followed by a loss of consciousness, intense tachycardia with associated central chest pain, and palpitations that can occur with or independent of the pre-syncopal episodes. (Tr. 430). She endorsed decreased appetite, weight loss, difficulty sleeping, night sweats, hot flashes and chills, dizziness, fatigue, intermittent blurred and double vision, seeing occasional black spots in her peripheral vision, excessive tearing, eye irritation, ringing in the ears, nasal discharge, nose bleeds, sinus pain, sinus congestion, lightheadedness, abdominal pain, nausea, excessive belching, urinary urgency, back pain and difficulty walking due to foot pain, severe pain in the right upper arm and right trapezius muscle, bruising on the thigh after a recent fall, short-term memory loss, headaches, dizziness upon standing, severe brain fog, slurring of speech not tied to medication dose, drooling, weakness and numbness in the leg, numbness and tingling in the feet, trouble with coordination, tremors in the hands, balance issues, anxiety, nervousness, depression, sadness, stress, and allergies. (Tr. 432-33).

Psychiatric examination revealed intact recent and remote memory, normal judgment and insight, and normal attention span and concentration. (Tr. 433). Physical examination revealed diminished breath sounds bilaterally, grossly normal range of motion of major joints, and diminished lower extremity muscle group strength. (Tr. 433-34). While the doctor did not observe any difficulties, she deferred a detailed range of motion examination and noted "baseline difficulty flexing at the waist." (Tr. 433). Dr. Guarino-Vogler ordered a brain MRI and prescribed Keppra "more as a stop-gap safety measure since she has had repeated falls with injury, in case she is having focal seizures like her daughter. If symptomology changes with use of the medicine, then [it] will

raise suspicion of seizure disorder and will refer to neurologist if brain MRI is unavailing." (Tr. 434). Ms. Simms's brain MRI was unremarkable. (Tr. 484-85).

On January 7, 2022, Dr. Guarino-Vogler messaged Ms. Simms about whether she experienced any change with the added seizure medication. (Tr. 456). Ms. Simms indicated she had not had any seizures since but remained dizzy all day. (*Id.*). That same day, Mr. Meeker authored a summary of Ms. Simms's mental impairments, stating:

> Due to chronic struggles with anxiety and depression, Jennifer has difficulty concentrating on different tasks as she will become overwhelmed. She is diagnosed with Generalized Anxiety Disorder, Persistent Depressive Disorder (Dysthymia), and Post Traumatic Stress Disorder. Feeling overwhelmed will continue to elevate symptoms. Jennifer's husband passed away on December 13, 2018. His death was unexpected. A sister that Jennifer was close to moved out of state in May of 2021. Jennifer lives at home with her two children. Jennifer reported a diagnosis of Degenerative Disc Disease and she has reported struggles with chronic headaches.
>
> Due to symptoms of anxiety and low energy, she has difficulty cleaning her home. She has difficulty in locations with various people and this has created difficulty with shopping and driving. Due to Jennifer's anxiety during social interactions, she has been unable to consistently perform any duties involving interactions with people. Social interactions have been done with difficulty in different social and professional settings. Jennifer is working as a phlebotomist but due to anxiety, has been unable to concentrate, interact with patients, and perform duties.
>
> Medications are being monitored by Jennifer's primary doctor. These medications are prescribed by her primary doctor. Treatment goals are for Jennifer to learn to cope with anxious thoughts and to address her symptoms of depression. Due to chronic nature of Jennifer's symptoms, there is no target date at this time. Currently, due to Jennifer's interaction with staff and patients resulting in anxiety, Jennifer would not be able to return to work with patients and phlebotomy. She will need to continue treatment to address her symptoms of anxiety.

(Tr. 396).

On February 24, 2022, Ms. Simms attended a follow-up appointment with Dr. Guarino-Vogler and complained of continued pain in her legs "with pins and needles paresthesias," more falling episodes, and continued slurred speech. (Tr. 483). She denied any seizure-like episodes since

taking Keppra. (*Id.*). Based on a misunderstanding, Ms. Simms took more oxycodone than prescribed, causing her to run out early. (*Id.*). Dr. Guarino-Vogler continued Keppra and referred Ms. Simms to a neurologist, a spine specialist, and an ENT to check if her inner ear is the source of her dizziness. (*Id.*).

## IV.   OTHER RELEVANT EVIDENCE

In 2020 and 2021, Ms. Simms was on disability through her employer. (Tr. 44). Dr. Guarino-Vogler completed several Attending Provider Statements indicating Ms. Simms was totally unable to work and her absence was medically necessary. (*See* Tr. 391). The Statement provides space for the treating provider to identify the employee's diagnoses, treatment plans, medications, objective clinical findings, functional limitations that prevent the employee from working, and the estimated time the employee will remain unable to work. (*See id.*).

On December 30, 2020, Dr. Guarino-Vogler indicated Ms. Simms was unable to work as of December 3, 2020 and would remain so through January 10, 2021. (Tr. 391). The doctor indicated that Ms. Simms had "grief/adjustment disorder/depressed mood" and experienced symptoms of poor concentration, poor control of crying, anger, impulsivity, panic attacks, and insomnia. (*Id.*). The doctor reported switching Ms. Simms to a new anti-depressant and referring her to mental health counseling. (*Id.*). Dr. Guarino-Vogler projected Ms. Simms could return to work on January 11, 2021. (*Id.*).

On January 10, 2021, Dr. Guarino-Vogler extended Ms. Simms's return-to-work date to February 1, 2021, citing increased panic attacks, decreased ability to perform activities of daily living, decreased clarity of thinking, and some memory loss. (Tr. 390). She reported increasing the frequency of Ms. Simms's counseling visits and changing her medication regimen. (*Id.*).

On February 5, 2021, Dr. Guarino-Vogler extended Ms. Simms's return-to-work date to April 1, 2021, citing worsening anxiety and depression, grief reaction, increasing difficulty with memory and activities of daily living. (Tr. 386). She reported changing Ms. Simms's medication due to side effects and continuing her weekly counseling sessions. (*Id.*).

### THE ALJ'S DECISION

The ALJ's decision included the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2024.

2. The claimant has not engaged in substantial gainful activity since December 7, 2020, the alleged onset date (20 CFR 404.1571 *et seq.*).

3. The claimant has the following severe impairments: lumbar degenerative disc disease, diabetes mellitus, obesity, post-traumatic stress disorder, anxiety and depression (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except avoid ladders, ropes, and scaffolds; would benefit from a sit/stand option every hour of standing, sitting 5 minutes on task; Occasional pushing/pulling with the bilateral upper extremities; Frequent reaching in all directions with the bilateral upper extremities; Occasional foot controls with the bilateral lower extremities; Avoid hazards; Occasional but superficial interactions with coworkers and supervisors, with superficial being defined as that which is beyond the performance of job duties and job functions for a specific purpose and short duration. Tandem work, and interaction with the public should be avoided. The hypothetical individual should avoid positions that require supervision, arbitration, delegation, or management skills; would be otherwise off task for up to 20 minutes of the day in increments of 3-4 minutes at a time due to pain.

6.      The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.      The claimant was born on October 19, 1978 and was 42 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).

8.      The claimant has at least a high school education (20 CFR 404.1564).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569a).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from December 7, 2020, through the date of this decision (20 CFR 404.1520(g)).

(Tr. 13-26).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of*

18

*Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). However, "a substantiality of

evidence evaluation does not permit a selective reading of the record. Substantiality of evidence

must be based upon the record taken as a whole. Substantial evidence is not simply some evidence,

or even a great deal of evidence. Rather, the substantiality of evidence must take into account

whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Soc. Sec.*, 531 F. App'x

636, 641 (6th Cir. 2013) (cleaned up).

In determining whether the Commissioner's findings are supported by substantial

evidence, the court does not review the evidence de novo, make credibility determinations, or

weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's

position, the court cannot overturn "so long as substantial evidence also supports the conclusion

reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so

because there is a "zone of choice" within which the Commissioner can act, without fear of court

interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d

1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision is supported by

substantial evidence, the Court must determine whether proper legal standards were applied. The

failure to apply correct legal standards is grounds for reversal. Even if substantial evidence supports

the ALJ's decision, the court must overturn when an agency does not observe its own regulations

and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*,

378 F.3d 541, 546–47 (6th Cir. 2004).

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted); accord *Shrader v. Astrue*, No. 11 13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

### STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 404.1520—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. § 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

### DISCUSSION & ANALYSIS

Ms. Simms asserts the ALJ's RFC was flawed in two respects. First, she claims the ALJ did not properly evaluate the medical opinions under 20 C.F.R. § 404.1520c, particularly those of Dr. Guarino-Vogler, Dr. Mahmood, and the State agency psychological consultants, claiming the ALJ failed to provide substantive analysis or substantial support for her conclusions, gave legally incorrect reasons for her conclusions, and did not adequately balance the appropriate regulatory factors. (Pl.'s Br., ECF #8, PageID 527-28). Second, Ms. Simms claims the ALJ improperly defined "superficial interaction" so as "to make it ineffective and not based on substantial evidence"; additionally, the ALJ's definition "does not comport with the definition provided by the Appeals Council and thus, the RFC is not supported by substantial evidence." (*Id.* at PageID 535). In response, the Commissioner claims the ALJ's evaluation of the medical opinion evidence complied with Agency regulations, and she reasonably accounted for Ms. Simms's limitations in social interaction. (Comm'r's Br., ECF #11, PageID 553, 557).

A.    **Medical Opinions**

A claimant's RFC is an administrative assessment of the extent to which the claimant's impairments and related symptoms may cause physical or mental limitations or restrictions that may affect the capacity to do work-related activities. SSR 96-8p, 1996 WL 374184, at *2. The RFC must be based on all relevant evidence in the case record, including but not limited to medical history, medical signs and laboratory findings, the effects of treatment, reports of daily activities, recorded observations, medical source statements, and the effects of symptoms. *Id*. at *5.

Because Ms. Simms filed her application after March 27, 2017, the ALJ is not required to defer to or give any specific evidentiary weight to a medical opinion, is not bound by the "treating physician rule," and is not required to give a treating source controlling weight. *See Jones v. Comm'r of Soc. Sec.*, No. 19-1102, 2020 WL 1703735, at *2 (N.D. Ohio Apr. 8, 2020). Instead, medical opinions are evaluated under 20 C.F.R. § 404.1520c. Under the revised regulations, the ALJ is to articulate "how persuasive [she] find[s] all of the medical opinions and all of the prior administrative medical findings in [the] case record." *Id*. at § 404.1520c(b).

In determining the persuasiveness of a medical opinion, the ALJ considers five factors: (1) supportability; (2) consistency; (3) relationship with the claimant, including length of treatment relationship, frequency of examinations, purpose of the treatment relationship, and examining relationship; (4) specialization; and (5) other factors that tend to support or contradict a medical opinion. 20 C.F.R. § 404.1520c(c)(1)-(5). The ALJ must articulate the consideration given to the medical opinions in the record, grounded in the two "most important factors" of supportability[2]

---

[2]    "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his medical opinion(s) or prior administrative

and consistency.[3] 20 C.F.R. § 404.1520c(a). An ALJ must explain how she considered the factors of supportability and consistency, and "may, but [is] not required to" explain the remaining factors of relationship with the claimant, specialization, or other factors, absent the ALJ's finding that two opinions are "equally" persuasive. *See* 20 C.F.R. § 404.1520c(b)(2)-(3). That said, just because an ALJ does not specifically use the words "supportability" and "consistency" does not mean the ALJ did not consider those factors. *Hardy v. Comm'r of Soc. Sec.*, No. 2:20-CV-4097, 2021 WL 4059310, at *2 (S.D. Ohio Sept. 7, 2021).

Although agency regulations no longer require deference to a treating physician's opinion, the reason-giving requirement still exists so claimants (and reviewing courts) may understand the disposition of their claims. *See Hardy v. Comm'r of Soc. Sec.*, 554 F. Supp. 3d 900, 908 (E.D. Mich. 2021) (applying the reason-giving requirement "with equal force to the new regulations, which require explanations for determinations that a medical opinion is unpersuasive."). Agency regulations "set forth a 'minimum level of articulation' to be provided in determinations and decisions, in order to 'provide sufficient rationale for a reviewing adjudicator or court.'" *Warren I. v. Comm'r of Soc. Sec.*, No. 20-495, 2021 WL 860506, at *8 (N.D.N.Y. Mar. 8, 2021) (quoting 82 Fed. Reg. 5844-01 (2017)). An "ALJ's failure . . . to meet these minimum levels of articulation frustrates [the] court's ability to determine whether [the claimant's] disability determination was supported by substantial evidence." *Vaughn v. Comm'r of Soc. Sec.*, No. 20-1119, 2021 WL 3056108, at *11 (W.D. Tenn. July 20, 2021). While the new regulations may be less demanding than the

---

medical finding(s), the more persuasive the opinion(s) and finding(s) will be." 20 C.F.R. § 404.1520c(c)(1).

[3]      "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the opinion(s) and finding(s) will be." 20 C.F.R. § 404.1520c(c)(2).

former rules, "they still require that the ALJ provide a coherent explanation of [her] reasoning." *Lester v. Saul*, No. 20-01364, 2020 WL 8093313, at *14 (N.D. Ohio Dec. 11, 2020), *report and recommendation adopted*, 2021 WL 119287 (N.D. Ohio Jan. 13, 2021). And "because of the greater latitude afforded ALJs under the new regulations, the importance of cogent explanations is perhaps even more important." *Hardy*, 554 F. Supp. 3d at 908.

### 1.     Opinions Concerning Physical Functioning

On February 5, 2021, Dr. Guarino-Vogler completed a Medical Source Statement and offered opinions about how Ms. Simms's impairments limit her ability to perform work-related activities. (Tr. 287-92). The doctor opined Ms. Simms could frequently lift and carry up to 10 pounds, 11 to 20 pounds occasionally, citing her chronic lumbar degenerative disc disease and noting that "lifting weight of any significance or with any frequency" may exacerbate symptoms of pain. (Tr. 287). She determined Ms. Simms can sit for six hours, stand for one hour, and walk for one hour in an eight-hour workday and requires the ability to change positions. (Tr. 288). Dr. Guarino-Vogler concluded Ms. Simms can continuously perform handling, finger, and feeling activities, frequently reach in all directions, and occasionally push and pull with the bilateral upper extremities but does not identify any clinical or medical findings to support her opinion. (Tr. 289). The doctor noted that degenerative disc disease with accompanying sciatica can be aggravated by repetitive motion and therefore found Ms. Simms limited to occasionally operating foot controls. (*Id.*). She felt Ms. Simms must avoid exposure to unprotected heights, dust, odors, fumes, and pulmonary irritants, or extreme temperatures; can occasionally be exposed to moving mechanical parts, humidity and wetness, and vibrations; and frequently operate a motor vehicle. (Tr. 291). She determined Ms. Simms would be off task for about 5% of a typical workday and would miss, on

24

average, about one day a month. (*Id.*). Finally, she noted Ms. Simms can perform activities like shopping, travel without a companion for assistance, ambulate without an assistive device, walk at a reasonable pace, use standard public transportation, climb a few steps at a reasonable pace without a handrail, prepare simple meals and feed herself, care for personal hygiene, and can sort, handle, and use paper files. (Tr. 292). Dr. Guarino-Vogler noted "the majority of symptoms necessitating this work absence are psychological, not physical." (Tr. 290, 292).

The ALJ evaluated Dr. Guarino-Vogler's opinions and adopted most of the opined limitations into the RFC because they were supported by objective evidence and consistent with Ms. Simms's treatment history and activities of daily living. (Tr. 18-19). These limitations include the restriction to light exertion work (defined as lifting no more than 20 pounds at a time and frequently lifting 10 pounds), a sit/stand option to accommodate her need to change positions often, upper extremity push/pull and reaching limitations, lower extremity foot pedal limitation, and an indication of her need to be off task for up to 20 minutes a day in 3- to 4-minute increments, which aligns with the doctor's opinion that she will be off-task 5% of the workday. (Tr. 18). The ALJ noted these limitations were supported by Ms. Simms's complaints and the "rather unremarkable findings" on examination and were consistent with the conservative treatment Ms. Simms sought and with her reported activities of daily living. (Tr. 19). The ALJ determined the minimal abnormal findings, consisting of a singular notation to "baseline difficulty bending at the waist" and strength deficits in the lower extremities, "are not supported over time," and therefore inconsistent with the other evidence of record. (Tr. 20). Later, the ALJ stated:

> This primary care physician's opinion evidence is largely persuasive but with some specific limitations that are not persuasive. This doctor had been treating the claimant for long term conditions. Limitations with rare exception are reasonably supported by some abnormal findings on exam and imaging. Care was conservative

and sufficient for the claimant to manage her considerable activities of daily living including work. The claimant's employment ended for mental health reasons based on the reports in the record.

(Tr. 20). Specific opinions not adopted include the stand/walk limitations, and hazards related to heights, moving mechanical parts, operating a motor vehicle, and exposure to humidity/wetness, pulmonary irritants, extreme temperatures, and vibrations. (Tr. 291). The ALJ did not accept the stand/walk limitations from Dr. Guarino-Vogler because of the mild findings, treatment with medications without referral to pain management, physical therapy, or other treatment options, and Ms. Simms's reported daily activities. (Tr. 19). The ALJ declined to adopt limitations regarding work hazards beyond avoiding climbing ladders, ropes, and scaffolds because there was no support for the limitations in the record. (*Id.*).

Ms. Simms first claims the ALJ's only discussion of the supportability and consistency of Dr. Guarino-Vogler's opinion was that most of the limitations were supported and consistent with the record. (ECF #8 at PageID 530, referring to Tr. 18-19). Belying Ms. Simms's allegation is the ALJ's specific finding that Dr. Guarino-Vogler's opinion was partially persuasive in light of the mild clinical findings, Ms. Simms's limited treatment history consisting of medications without referral to pain management, physical therapy, or other treatment options, and with her reported activities of daily living, including cooking, childcare, walking, doing laundry, sweeping, washing dishes, making beds, and using the internet. (Tr. 19). Indeed, the ALJ did more than simply state most of the doctor's limitations were supported and consistent; she addressed the limitations not adopted and determined they were inconsistent with other objective medical and nonmedical evidence in the record, sufficient to meet the substantial evidence standard. (*See Id.*).

Ms. Simms argues that Dr. Guarino-Vogler's stand/walk limitations "are consistent with treatment notes that indicated high levels of pain and neuropathy symptoms," citing her self-reported symptoms and reports of intense pain, changes in pain medication, her complaints of neuropathy, moderate bilateral S1 radiculopathy, and a single instance of decreased muscle strength in the lower extremities. (ECF #8 at PageID 530). Ms. Simms does not claim the ALJ failed to consider this evidence, only that her conclusion is wrong. (*Id.* at PageID 530) ("all of Dr. Guarino-Vogler's limitations should have been persuasive and included in the RFC"). It bears repeating that even if substantial evidence supports a claimant's position, a reviewing court will not disturb the ALJ's decision so long as substantial evidence also supports the conclusion the ALJ reached. *Jones*, 336 F.3d at 477.

Regarding work hazards, the ALJ found no support in the record for such limitations and later attributed Ms. Simms's dizziness and lightheadedness to a sinus infection. (Tr. 19, 20). Ms. Simms appropriately notes the medical record directly contradicts the ALJ's conclusion that her dizziness resolved with resolution of the sinus infection. (ECF #8 at PageID 531). To be sure, Ms. Simms did have a sinus infection in November 2021 and received antibiotics (Tr. 480) but continued to complain of dizziness in January and February 2022. (*See* Tr. 430, 456, 483). In fact, Dr. Guarino-Vogler referred Ms. Simms to an ENT in February to determine the source of her dizziness. (Tr. 483).

However, this misstatement of the evidence does not require remand because even if the ALJ adopted Dr. Guarino-Vogler's work hazard restrictions into the RFC, the additional restrictions would have no effect on her ability to perform the past relevant work the VE identified at the administrative hearing. According to the *Dictionary of Occupational Titles,* the identified

positions do not require exposure to heights, moving mechanical parts, humidity/wetness, temperature extremes, other environmental conditions, or vibration. *See* DICOT 239.567-010, 1991 WL 672232; DICOT 209.587-034, 1991 WL 671802; and DICOT 222.587-034, 1991 WL 672122. Ms. Simms does not identify additional limitations the ALJ should have included in the RFC to account for her dizziness. "No principle of administrative law or common sense requires [a reviewing court] to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result." *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 507 (6th Cir. 2006).

On May 1, 2021, Ms. Simms attended a consultative physical examination with Bilal Mahmood, M.D., where she alleged disability due to degenerative disc disease, chronic pain radiating down her leg, and foot pain, exacerbated by prolong sitting and standing. (Tr. 298). She rated her back and leg pain at 10 on a 10-point scale and stated this was typical. (*Id.*). She described her feet as numb, tingly, and constantly cold, exacerbated by exposure and improved with warm water, and rated her current pain intensity as 10 on a 10-point scale, with 8 being typical. (*Id.*). Despite the alleged pain, Ms. Simms appeared in no acute distress during the examination. (Tr. 299). She identified typical daily activities including cooking, taking care of children, walking, doing laundry, sweeping, washing the dishes, using the internet, and making the bed. (*Id.*).

On examination, Ms. Simms was alert and had clear thought processes, normal memory, and good concentration, her gait was steady and symmetric, and, with the exception of low back tenderness, physical examination was otherwise normal. (Tr. 301). Ms. Simms could squat and rise with ease, rise from a sitting position without assistance, get up and down from the examination

table, walk on heels and toes, and stand, but not hop, on one foot bilaterally. (Tr. 301-02). Dr.

Mahmood offered the following summary:

> On physical examination, the claimant has a morbidly obese body habitus. She has tenderness to palpation of the low back paraspinal muscles and is unable to hop on one foot bilaterally, most likely secondary to her back pain as well as her body habitus. She does endorse radicular pain into the right leg when bending forward. Otherwise, the physical examination was unremarkable.
>
> The claimant has no limitations with sitting, standing or walking. The claimant does not need an assistive device with regard to short and long distances and uneven terrain. The claimant does not have significant limitations with lifting or carrying weight. There are no limitations on reaching, grasping, handling, fingering and feeling. There are no relevant visual, communicative or workplace environmental limitations.

(Tr. 302).

The ALJ determined Dr. Mahmood's opinion was "supported by the findings at the

evaluation and consistent with the claimant's treatment history overall." (Tr. 19). Indeed, Dr.

Mahmood's physical examination was entirely normal apart from some low back tenderness and

an inability to hop on one foot bilaterally and treatment was limited to using pain medication

without referral for other treatment modalities such as physical therapy or pain management. Ms.

Simms claims Dr. Mahmood's opinion is not supported by his examination notes because the

consultative examiner disregarded her high pain levels. (ECF #8 at PageID 532).

Ms. Simms reported to Dr. Mahmood 10/10 pain intensity in her back, legs, and feet. (Tr.

298). But physical examination revealed normal gait, coordination, and sensation, and Ms. Simms

was in "no acute distress" during the examination. (Tr. 300-02). This does not suggest the

consultative examiner ignored Ms. Simms's pain but rather specifically considered it along with the

largely normal examination findings. Aside from some low back tenderness, Dr. Mahmood

revealed no other abnormal clinical findings that could reasonably align with her pain. Ms. Simms

29

has not identified an error in this respect. Moreover, the ALJ independently considered her statements about the intensity, persistence, and limiting effects of her symptoms and determined they were largely inconsistent with her reports to treating providers, objective medical evidence, treatment history, and reported activities of daily living. (Tr. 17). Specifically related to the consultative examination, the ALJ emphasized the inconsistency, stating, "While she alleged 10/10 pain at the consultative examination, she was noted to be in no acute distress." (Tr. 19). While the ALJ found Ms. Simms's statements inconsistent with the intensity of her pain, the ALJ did not conclude Ms. Simms was free of pain and limited her RFC accordingly. (*Id.*) ("limited to light exertional level in consideration of her pain complaints"). Ms. Simms does not challenge the ALJ's assessment of her statements.

Ms. Simms next claims "it is impossible for both [Dr. Guarino-Vogler's and Dr. Mahmood's] opinions to be persuasive," and the ALJ "failed to create a logical bridge to explain this contradiction to subsequent reviewers." (ECF #8 at PageID 532). This argument ignores the particularities of the ALJ's evaluation of these opinions. The ALJ did not find them persuasive on the same issues; rather, she found Dr. Mahmood's opinion of the stand/walk limitations *more persuasive* than Dr. Guarino-Vogler's opinion on the subject and cited specific evidence that substantially supported her conclusion. (Tr. 19).

I find that substantial evidence supports the ALJ's analysis of the medical opinions concerning Ms. Simms's physical functioning.

### 2. Opinions Concerning Mental Functioning

Ms. Simms next argues the ALJ did not properly address the supportability and consistency factors in her evaluation of the State agency psychological consultants' opinions and did not give a

reason for omitting certain limitations from the RFC, including limitations to simple instructions, occasional changes that are gradually introduced, and no fast-paced demands. (ECF #8 at PageID 532).

State agency psychological consultant Michell Hoy-Watkins reviewed Ms. Simms's medical records and offered the following opinions and supporting explanations regarding her functional limitations:

- Symptoms of depression and panic would limit her ability to sustain effort and concentration to persist to task completion. She retains the capacity for simple and complex tasks in a setting without demands for fast pace or strict production quotas.

- In light of her reported panic attacks, she retains the capacity to relate adequately with others in a low demand setting for activities that do not require regular contact with the general public. No supervising, delegating tasks, or arbitration.

- She can deal with occasional changes in routine. She can handle major changes if they are communicated in advance and implemented slowly.

- She retains the ability to understand, remember, and follow simple instructions with adequate concentration, persistence, and pace. The claimant can adapt to predictable changes and work-related stressors. The claimant can engage in brief and superficial interactions.

(Tr. 68-69).

On reconsideration, State agency psychological consultant Janet Souder, Psy.D., affirmed Ms. Hoy-Watkins's opinion. (Tr. 81). I note here that the consultants did not opine that Ms. Simms was limited to the performance of simple tasks, nor that she needed occasional changes in routine gradually introduced. Therefore, I do not address these particular issues.

The ALJ evaluated those opinions as follows:

The State agency psychological consultants found the claimant to be moderately limited except in understanding, remembering or applying information. They suggested simple and complex [*sic*] without demands for fast pace or strict

31

production quotas in setting with occasional changes in routine and major changes communicated in advance and implemented slowly. She was found capable of simple work with adequate concentration, persistence or pace, can adapt to predictable changes and work-related stressors, brief and superficial interactions. The undersigned considered the claimant's testimony, the records, and the opinion evidence and has made some modifications to the final mental residual functional capacity to best reflect the claimant's functioning. This considers the evidence in her favor, giving her the benefit of the doubt in including these limitations. Considering the biggest problem, she has been reduced to only occasional interaction with supervisors and co-workers with interaction with the general public to be avoided. The claimant expressed anxiety about returning to direct patient care. Furthermore, both the quantity and quality of tolerable interactions has been detailed in the residual functional capacity. She has been limited to only superficial interaction with co-workers and supervisors, with a definition provided for clarity. Specific work has been precluded to avoid exacerbation of her mental symptoms such as tandem work and work that would require her to engage in supervision, arbitration, delegation, or management skills. These limitations address her moderate deficits in concentrating, persisting and maintaining pace and in adapting and managing herself, as these strict limitations would prevent symptoms that would interfere with her abilities in these areas. In the absence of such limitations, the claimant would not be able to effectively concentrate, persist or maintain pace or handle the stressors of interactions without such limitations. Thus, these limitations work together to provide a lower stress work environment, one in which she can tolerate the limited interactions included without exacerbations of her mental health symptoms and perform the work within these parameters. The residual functional capacity also contains an off-task limitation in consideration of her pain and any other residual symptoms that would take her off task. Thus, the State agency psychological consultants' assessments are persuasive only in part. They did suggest significant social interaction limitations, some of which were included such as avoiding contact with the general public, and others which have been updated with the more recent evidence at the hearing level. Thus, where changes were necessary, their assessments are less persuasive. The State agency psychological consultants had far less evidence to consider with regard to the claimant's mental functioning, and thus the limitations required some changes.

(Tr. 22-23) (cleaned up; internal citations omitted).

While the ALJ did not explicitly mention the terms "supportability" and "consistency," she made clear that State agency psychological consultants did not have access to the most recent treatment records, which revealed improvement in Ms. Simms's ability to manage her depression, anxiety, and panic attacks. (*See* Tr. 21) ("review of the counseling records shows that the claimant

was managing exposure to people, was able to get out and shop, drive, go to the park, go to the casino, go to the mall, visit, entertain, and manage the care of others"). True enough, the State agency psychological consultants did not have access to treatment records post-dating August 16, 2021. (Tr. 74). The consultants' opinion that Ms. Simms should avoid positions that require fast-paced production requirements was based on the negative effects of her symptoms of depression, anxiety, and panic attacks. After summarizing Ms. Simms's testimony and her reported symptoms, the ALJ explained as follows:

> Thus, the claimant alleged disability prior to initiating any counseling for her mental impairments, and with treatment, she does improve with better control over her panic attacks, anxiety and depression. Social Security disability requires durational symptoms which are not supported here to well after the alleged onset date, and by that time, symptoms had improved and functioning was less limited. The medical source statements that fail to recognize improvement with treatment and assess very limiting abilities are not reflecting her functioning with treatment, but rather an acute stress reaction lasting less than twelve months. This is not to say that the claimant's mental impairments have resolved, but rather that they are improved and do not require the extent of limitation indicated in some of the medical opinion evidence.

(Tr. 18). The ALJ's reliance on records showing improvement and better management of the symptoms that would interfere with concentration and task persistence offers substantial evidence supporting the ALJ's declination to adopt the State agency consultants' limitation to no fast-paced work.

I find that substantial evidence supports the ALJ's analysis of the opinions concerning Ms. Simms's mental functioning.

**B.      Superficial Interaction**

Last, Ms. Simms argues the ALJ failed to explain how her definition of superficial interaction was created. (ECF #8 at PageID 535). She claims it is an arbitrary definition not

33

supported by the record and, as such, it is impossible for a subsequent reviewer to trace the ALJ's reasoning. (*Id.* at PageID 536). The issue is whether the ALJ's failure to explain how she arrived at her definition of "superficial" interaction requires a remand for further proceedings. A review of cases addressing similar situations indicates otherwise.

In *Betz v. Comm'r of Soc. Sec.*, No 3:21-cv-2408, 2022 WL 17717496 (N.D. Ohio Nov. 8, 2022), *report and recommendation adopted*, 2022 WL 17985680 (N.D. Ohio Dec. 29, 2022), the court addressed a situation where the ALJ determined the plaintiff was limited to "superficial contact," defined as "no tasks involving arbitration, negotiation, confrontation, directing the work of others, persuading others or being responsible for the safety or welfare of others." *Id.* at *1. There, the plaintiff argued the ALJ erred by failing to provide any reasoning or explanation for using that definition. *Id.* at *10. The *Betz* Court rejected the argument, explaining in relevant part:

> The term "superficial interaction" is not defined under the Dictionary of Occupational Titles ("DOT") or Selected Characteristics of Occupations ("SCO"). *See Stoodt v. Comm'r of Soc. Sec.*, No. 3:20-cv-2370, 2022 U.S. Dist. LEXIS 43108, at *49, 2022 WL 716105 (N.D. Ohio Jan. 13, 2022). And there have been contrary findings as to whether the "plain meaning" of the term requires further definition. *See Beulah v. Comm'r of Soc. Sec.*, No. 1:20-cv-2271, 2022 U.S. Dist. LEXIS 92055, at *94, 2022 WL 1609236 (N.D. Ohio Mar. 25, 2022) (holding that the term "superficial" does not have a defined meaning for purposes of vocational testimony); *but contrast Dawn M. v. Comm'r of Soc. Sec.*, No. 3:20-cv-0258, 2022 U.S. Dist. LEXIS 102055, at *18, 2022 WL 2037804 (S.D. Ohio June 7, 2022) (holding that the term "superficial" "is a well-defined limitation in the Social Security context."). In cases in which the definition of "superficial" interaction has been in dispute, however, it has been tied to the consideration of VE testimony or a medical opinion. *See e.g., Stoodt*, 2022 U.S. Dist. LEXIS 43108 at *47-54, 2022 WL 716105 (remanding the ALJ's decision because the ALJ failed to build a logical bridge between the evidence and the ALJ's finding that the claimant was limited to "superficial" interactions when such findings were contrary to the state agency consultants' opinions); *Beulah*, 2022 U.S. Dist. LEXIS 92055 at *86-98, 2022 WL 1609236 (remanding the ALJ's decision because the ALJ failed to adequately explain her failure to include a "superficial" interaction limitation in the RFC after putting one to the VE).

\* \* \*

At its core, Betz's argument rests on the contention that the ALJ failed to adequately explain how he chose his definition of the term superficial contact, making the definition arbitrary. The ALJ, however, defined the scope of "superficial" interactions and used that definition both in posing hypothetical questions to the VE and in articulating his RFC findings. (Tr. 20, 57-58). Further, none of the opinion evidence provided a conflicting definition of superficial contact. Thus, unlike other cases that have addressed an ALJ's use of the term "superficial" interactions, this case does not hinge on whether the ALJ's definition was consistent with the VE's or other opinions' articulations.

\* \* \*

Looking at the decision as a whole and with common sense allows for meaningful review of the ALJ's evaluation of Betz's RFC. *See Reynolds*, 424 F. App'x at 416. Although the ALJ must connect the RFC limitations to the evidence and build a logical bridge between the two, this does not require that the ALJ provide explicit reasoning for why he defined superficial the way he did. Rather, the ALJ needed to explain why he determined that Betz was limited to superficial contact *as he defined it*, and it is sufficient that the record not be clearly contrary to that definition. *See Fleischer*, 774 F. Supp. 2d at 877. And here, the ALJ's discussion of the record evidence related to Betz's mental health conditions built such a bridge.

\* \* \*

Although the ALJ did not explicitly provide a reason for why he chose to define "superficial" as he did, the evidence both makes such a definition reasonable and does not directly contradict any portion of it. Nor has Betz identified any contradictory evidence. As such, for us to nitpick the ALJ's definition of "superficial" would risk involving us with invading the zone of choice within which the Commissioner operates . . . .

*Id.* at \*10-12 (citation omitted); *see also Richard S. v. Comm'r of Soc. Sec.*, No. 2:22-cv-2176, 2023 WL 2805347, at \*14 (S.D. Ohio Apr. 6, 2023) (concluding that ALJ did not err by crafting a vocationally relevant definition of "superficial interpersonal contact" where such definition was "supported by substantial evidence" and "not contradicted by other record evidence"), *report and recommendation adopted*, 2023 WL 6318135 (S.D. Ohio Sep. 28, 2023); *Charlee N. A. v. Comm'r of Soc. Sec.*, No. 2:22-cv-3085, 2023 WL 312791, at \*5 (S.D. Ohio Jan. 19, 2023) ("The undersigned

35

agrees with those courts that find no reversible error where the opining source neglects to define the term 'superficial interaction' and the ALJ provides a sufficient explanation for why he or she determined that the claimant was limited to superficial contact as the ALJ defines that term.") (*citing Betz*, 2022 WL 17717496), *report and recommendation adopted*, 2023 WL 1766096 (S.D. Ohio Feb. 3, 2023).

In this case, the State agency psychologists opined Ms. Simms was limited to "superficial interactions" without defining the term "superficial." (Tr. 69, 81). Prior to the administrative hearing, the ALJ asked the VE to respond to pre-hearing interrogatories. (Tr. 272-73). Interrogatory number 7 provided the VE with the same RFC at issue here, including the definition of "superficial" as "that which is beyond the performance of job duties and job functions for a specific purpose and a short duration." (Tr. 273). The ALJ adopted the limitation to superficial interactions with coworkers and supervisors as she defined it. (Tr. 16).

Although the ALJ did not explain how she arrived at her definition of superficial, the definition is supported by substantial evidence and not contradicted by the other record evidence. The state agency psychologists opined that Ms. Simms is moderately limited in her ability to maintain attention and concentration for extended periods of time, work in coordination with or in proximity to others without being distracted by them, perform at a consistent pace without an unreasonable number and length of rest periods, interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, get along with co-workers without distracting them or exhibiting behavioral extremes, and respond appropriately to changes in the work setting. (Tr. 68-69, 80-81). To account for these moderate limitations, the psychologists determined she can perform simple and complex tasks in a setting without demands

for fast pace or strict production quotas, adequately relate with others in a low demand setting for activities that do not require regular contact with the general public, adapt to predictable changes and work-related stressors, engage in brief and superficial interactions, and must avoid positions involving supervising others, delegating tasks, or arbitration. (*Id.*). The ALJ adopted the limitation to superficial interaction, set forth a definition of the term, and provided limitations to avoid tandem work (working together with others) and positions that require supervision, arbitration, delegation, or management skills. (Tr. 16). She explained how the limitations accommodate "her moderate deficits in concentrating, persisting, and maintaining pace and in adapting and managing herself, as these strict limitations would prevent symptoms that would interfere with her abilities in these areas." (Tr. 16, 22). She further explained "in the absence of such limitations, Ms. Simms would not be able to effectively concentrate, persist, and maintain pace or handle the stressors of interactions," and "these limitations work together to provide a lower stress work environment, one in which she can tolerate the limited interactions included without exacerbations of her mental health symptoms and perform work within these parameters." (Tr. 22).

The ALJ's defined scope of "superficial" interactions was incorporated into the RFC determination and into a hypothetical question posed to the VE. Ms. Simms does not cite to opinion evidence that contradicts the ALJ's definition. Similar to *Betz,* the ALJ was required to "explain why he determined that [plaintiff] was limited to superficial contact *as he defined it*, and it is sufficient that the record not be clearly contrary to that decision." *Betz,* 2022 WL 17717496, at *11 (emphasis in original). The ALJ's discussion of the medical record and the State agency

psychologists' opinions substantially support the ALJ's definition of "superficial," thereby enabling a meaningful review of the decision.

### CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, I recommend the District Court **AFFIRM** the Commissioner's decision denying disability insurance benefits.

Dated: November 3, 2023

_____
DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

### OBJECTIONS, REVIEW, AND APPEAL

**Within 14 days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the Magistrate Judge. *See* Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1); Local Civ. R. 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.**

**Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal, either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the Report and Recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the Report and Recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the Magistrate Judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*, 932 F.2d at 509). The failure to assert specific objections may in rare cases be excused in the**

interest of justice. *See United States v. Wandahsega,* 924 F.3d 868, 878-79 (6th Cir. 2019).